### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**CARLOS R. SARRIA-ORTEGA**
      **Plaintiff**

                                                    **Civil No. 02-2038(PG)**

      **v.**

**HON. JUAN AGOSTO-ALICEA ET AL**
      **Defendants**

---

### MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION[1]

Plaintiff Carlos R. Sarria-Ortega (hereafter "Sarria"), through counsel, filed a complaint on July 9, 2002, pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights pursuant to the First and Fourteenth Amendments of the United States Constitution **(Docket No. 1)**.  Supplemental state claims were also raised.

At the time Sarria was an employee of the Government Development Bank.  It is alleged within the complaint that he was demoted as a result of political discrimination following the Puerto Rico general elections held in November 2000.  Sarria also alleged that he was not afforded the right to due process to which he was entitled.  He further asserted that the actions taken by defendants against him were the result of his political affiliation to the New Progressive Party (NPP).

Defendants Juan Agosto-Alicea (hereafter "Agosto-Alicea"), in his personal and official capacity, and the Government Development Bank (hereafter "GDB") have moved for summary judgment, the same being

---

[1] This Report and Recommendation was being edited and about to issue at the time notice was provided regarding plaintiff Sarria's death.

opposed by plaintiff (**Docket Nos. 46, 48, 59, 65**).    The defendants also filed a
Request for Action on Pending Motion for Summary Judgment (**Docket No. 84**).
The motions were referred to the undersigned for report and recommendation
(**Docket No. 93**).

I.      **Factual Background[2]**

        Sarria has a Bachelor's degree in Business Administration and has taken
several courses in Accounting, but he does not have a concentration in
accounting or finance.  *Uncontested Fact No. 4.*  On December 18, 1995, Sarria
began working at the GDB as an Operations Supervisor of the Human
Resources Department. *Uncontested Fact No. 1.*  He was advised on November 4,
1998, that effective November 16, 1998, his position was reclassified to that
of Payroll Manager.  (**Docket No. 59**, Ex. 2.)

        Afterwards, the position of Pre-Intervention Director became available
and the Vice-President of Operations, Harry Torres (hereafter "Torres"),
asked the Director of Human Resources, Nadia Huertas (hereafter "Huertas"),
what personnel could qualify or be interested in the position.  (**Docket No. 65**,
Huertas dep. pp. 35-36, in Spanish.)  Torres asked Huertas to investigate and

---

        [2] The undersigned notes that plaintiff's response contains exhibits for the Court to
consider which are not in the English language.  Plaintiff did not file an English
translation of said exhibits in derogation of the Local Rules of this District Court.
Loc.Cv.R. 10.  More so, the First Circuit has made it clear that "[t]he law incontrovertibly
demands that federal litigation in Puerto Rico be conducted in English." 48 U.S.C. § 864
(2003).  That rule applies to trials as well as to the pre-trial process.  *Id.*  In collecting a
record for summary judgment a district court must sift out non-English materials, and
parties should submit only English-language materials." *Estades-Negroni v. Associates Corp. of North
Am.*, 359 F.3d 1, 2 (1st Cir. 2004) (citing *United States v. Rivera-Rosario*, 300 F.3d 1, 6 (1st
Cir.2002)).  The consequence of this is that, even if the Court considers the exhibits that
have not been translated into English, should any of the parties appeal the ruling of a
motion for summary judgment, said exhibits that have not been translated into English are
not and cannot on appeal become  part of the record.  *Id.*  With this caveat and advice, the
undersigned submits the above summary of facts.

corroborate whether Sarria was qualified for the position.  *Id.; Defendant.'s Fact No. 5.*  Torres also asked Huertas to see if there were other persons qualified for the position.  **(Docket No. 65**, Huertas dep. pp. 35-36, in Spanish.)

The position of Pre-Intervention Director, as per the GDB's "Class Specification," required one to hold a Bachelor's Degree in Business Administration with a major in accounting or finance from an accredited university.  **Docket No. 59**, Ex. 22.  It also required five years experience in pre-intervention or accounting and specified that at least one of the five years of prior experience be in banking, two of those being in personnel supervision. *Id.*

Reportedly, Huertas advised Torres that Sarria did not qualify for the position because he did not have a concentration in accounting.  *Uncontested Fact No. 7.*  Torres then told Huertas that he wanted to modify the requirements of the position to expand the pool of candidates.  *Uncontested Fact No. 8.*  Accordingly, Huertas spoke with Classification Specialist Istra Marrero (hereafter "Marrero") regarding the viability of changing or modifying the requirements for the position.  In order to achieve said objective, Marrero prepared a position profile which was to be used instead of the GDB "Class Specification." *Uncontested Fact Nos. 9, 11.*  Within the same document or position profile the minimum requirements for the position and the  description of duties appeared.  *Uncontested Fact No. 10.*  Huertas did not ask for a legal opinion regarding the correctness of using the position profile instead of the class specifications as set forth in the Personnel Regulations of the GDB.  *Uncontested Fact No. 11.*

The position profile lessened the requirements for the position.   It required a bachelor's degree without specifying the discipline, although it stated that the academic background should be related with the duties to be performed.  **Docket No. 59**, Ex. 22.  It also required five years experience, in general, without stating experience in what discipline, area or where from. *Id.* Finally, the position profile indicated that the combination of academic background and experience was acceptable, without offering any guides to determine the acceptability or equivalency of the academic background or the employment experience. *Id.*

A "recruiting rule" was prepared by Frances Rodríguez (hereafter "Rodríguez"). *Uncontested Fact No. 15.* According to defendants, the recruiting rule did not require a concentration in accounting or finance although one was required within GDB's class specification. *Defendant.'s Fact No. 16.* According to Sarria, the recruiting rule considered information available in the employment market and human relations and established the type of exams or type of competition recommended in each case.  Sarria refers to Section 6.4 of the Personnel Manual which specifies "that the president will be responsible to maintain updated that class specifications according to the changes and activities which may occur in the Bank."  (**Docket No. 65**, Plaintiff.'s Ex. 1 in Spanish.)  Torres and Huertas had approved and signed the recruiting rule on June 13, 2000. *Defendant.'s Fact  No. 16*.

The recruiting rule required a Bachelor's degree in Business Administration, with two courses in basic accounting, two courses in intermediate accounting or theory or problems of accounting, one course in

cost accounting or advanced accounting or tax accounting or auditing from an accredited college or university.  *Uncontested Fact No. 18.*  The record reflects that Sarria had taken the following related classes in obtaining his Bachelor's degree in Business Administration:  Basic Accounting I and II; Intermediate Accounting I and II; cost accounting; theories of accounting; and tax accounting.  *Defendant.'s Fact No. 19.*  Sarria explains that, most likely, all persons with an academic preparation in accounting have taken these courses.  *Plaintiff.'s Commentary to Defendant.'s Fact No. 19.*

On June 13, 2000, the Assistant Director of Human Resources, María Pagán-Russe (hereafter ''Pagán'') e-mailed Rodríguez and informed her that Sarria had been designated Interim Pre-Intervention Director.  **(Docket No. 59**, Ex. No. 14.*)*  Pagán requested for an evaluation of Sarria's qualifications for the position.  *Id.*  Rodríguez replied to the e-mail on June 14th and stated that ''according to the requirements in the Recruiting Rules of June 14, 2000'' Sarria was considered eligible to occupy the interim position.  *Id.*

Sarria was named the Interim Pre-Intervention Director on June 14, 2000.  *Uncontested Fact No. 21.*  On August 16, 2000, the Human Resources Office posted a notice for the position of Pre-Intervention Director which demanded the requirements specified in the June 14, 2000 recruiting rule.  *Defendant.'s Fact No. 22; Plaintiff.'s Commentary to Defendant.'s Fact No. 22.*  Eventually five candidates applied and were certified qualified for the position.  **Docket No. 59**, Ex. 22. Thereafter, on August 28, 2000, Sarria was informed that he was being promoted to the position of Pre-Intervention Director, effective September 1, 2000.  **Docket No. 59**, Ex. 17.  At the same time Sarria was advised that he would

be placed on a six-month probationary period and that, if his services were satisfactory, after that time he would be granted a regular appointment. *Id.* Sarria was further advised that the six-month probationary period would expire on February 28, 2001. *Id.*

In a letter dated October 2, 2000, addressed to Torres, one of the applicants for the position, Jorge L. Silén, questioned Sarria's selection. **Docket No. 59**, Ex. 22. Next, on November 15, 2000, by means of a letter written to Huertas, Silén objected to the selection process through his legal representative. *Id.* Torres and Huertas met and determined to refer the matter to the attorney for GDB. *Id*. The matter was referred on December 7, 2000. *Id.* Neither Torres nor Huertas responded to Silén's letters or concerns nor did GDB. *Id.*

The general elections took place in November 2000. As a result, the political power base changed from the New Progressive Party (hereafter "NPP") to the Popular Democratic Party (hereafter "PDP"). The change in the central administration of the government took place in January 2001.

In January 2001, defendant Agosto-Alicea was appointed President of the GDB, and following said appointment, Agosto-Alicea requested a study of all personnel transactions performed from July to December 2000. *Defendant.'s Fact No. 24.* Attorney Alba Caballero (hereafter "Attorney Caballero") was retained to conduct said study. *Defendant.'s Fact No. 24.* According to Sarria,

the only personnel actions evaluated were those involving NPP employees.[3]
(**Docket No. 65**, Huertas dep. p. 66-67 in Spanish; **Docket No. 65**, Caballero dep. p. 6 in Spanish.)

Next, on December 13, 2001, Sarria was advised by Huertas that Agosto-Alicea had determined to extend Sarria's probationary period to May 31, 2001, pursuant to Personnel Regulations 7.8.2. (**Docket No. 59**, Ex. 19.) Said regulation provides that the probationary period may be extended under extraordinary situations and with prior approval of the President of the GDB for not more than half of the time originally prescribed as the probationary period. (**Docket No. 65**, Ex. 1 in Spanish.)

Attorney Caballero rendered her report on April 9, 2001. Upon completing her investigation, Attorney Caballero concluded that Sarria's appointment was null and void because the requirements of the position were arbitrarily amended in violation of the principles of merit found in the Personnel Regulations and that persons of the GDB that met the minimum requirements for the position of Intervention Director were not selected. (**Docket No. 59**, Ex. Defendant.'s Fact No. 25.) Within the report it is specified that, although "[a]n employee of the [GDB] questioned the appointment; the Office of Human Resources and Labor Relations did not attend his complaint." *Id.*

---

[3] Huertas testified that the only appointments reviewed were those of persons affiliated with the NPP. The deposition testimony indicates that a list of all cases or files containing personnel transaction during the relevant period was provided to Attorney Caballero by the Director of Human Resources. Caballero analyzed the cases of more than twenty individuals. She did not find the personnel appointments null and void in all cases.

Sarria was notified on May 31, 2001, that several irregularities had been detected in his appointment to the position of Pre-Intervention Director, and that GDB intended to declare his appointment null and void, subject to an informal administrative hearing to be held on June 7, 2001, wherein Sarria could present evidence sustaining a contrary determination. **(Docket No. 59**, Ex. 20.) On July 12, 2001, Agosto-Alicea notified Sarria that because he did not meet the minimum requirements of the position to which he was appointed, said appointment was null. **(Docket No. 59**, Ex. 20.) Consistently, Sarria was further advised that he was being separated from the position of Pre-Intervention Director and was to be reinstated to the position of Payroll Manager, effective July 17, 2001. *Id.*

Sarria formally appealed the decision to the Board of Directors of the GDB. An examining officer was appointed and a formal hearing held. *Uncontested Fact No. 29*. Sarria alleged that his appointment as Pre-Intervention Director was valid and that the GDB's actions in invalidating his appointment and reinstating him to his previous position, denied him of his owner's right acquired over the salary he earned as Pre-Intervention Director and constituted an unequal treatment towards him because of his political idealism. A Resolution was rendered by June 18, 2002, wherein it was determined that Sarria's appointment to the position of Pre-Intervention Director was null and void as it was made in violation of the Personnel Regulations of the GDB. **(Docket No. 59**, Ex. 22.) The decision was not appealed.

Thereafter, in 2002, Sarria was diagnosed with primary non-Hodgkins' lymphoma of the central nervous system, receiving radiotherapy to the brain and chemotherapy.  **Docket No. 99**.

Sarria was deposed on July 31, 2003.  Sarria testified and indicated he is a life-long member of the NPP but is not politically active.  **(Docket No. 59**, Ex. 23, pp.96-97.)  Sarria also testified that the extent of his NPP activism is limited to the fact that he votes for the NPP.  *Id. at pp. 97-98.*  He does not participate in   political activities, caravans or rallies nor does he make monetary contributions to the NPP.  *Id.*  Also, while at the GDB, he never participated in any organization of NPP employees. *Id.*

During his deposition Sarria also testified that he never told anyone in the GDB of his political affiliation. *Id. at p. 98.*  However, he testified that people may have known he belonged to the NPP because of the persons he spent time with such as Iván Muñiz and Pablo Torres.  *Id.*  Sarria never spoke to Agosto-Alicea about his political affiliation. *Id.* Sarria related that Pedro Cintrón, Vice President of Administration and Accounting, once met with and told him that, even though he [Sarria] was NPP, he [Cintrón] was there to treat everyone the same.  *Id. at p. 100.*

Conversely, his wife on January 8, 2004,[4] signed an affidavit or sworn statement wherein she asserts that Sarria has always been an activist of the NPP participating in caravans, meetings, rallies, selling tickets and as an

---

[4] This affidavit was signed the day before the filing date of plaintiff's response to defendants' motion for summary judgment and almost six months after plaintiff's deposition.

electoral officer representative for the NPP.  (**Docket No. 65**, Ex. 5.)  She further states that Sarria was very active in all NPP activities where the GDB co-workers participated.  *Id.*  She explains that, although she was not present at her husband's deposition, when he was questioned about his political activism he understood the questioning alluded to the period of time he "was in the GDB and during working hours."  *Id.*

## II.    Analysis

The defendants move for summary judgment on the basis that the cause is precluded by reason of res judicata.  The defendants also contend Sarria has failed to establish a prima facie case of political discrimination because his appointment was null and void as per GDB personnel regulations; and that Sarria's claim for due process fails as he had no property right to the position.  Agosto-Alicea also asserts that he is entitled to qualified immunity.

### A.    Legal Standard

A motion for summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Wolf v. Gruntal & Co., Inc.*,  45 F.3d 524, 527 (1st Cir. 1995); *National Amusements, Inc., v. Dedham*, 43 F.3d 731, 735 (1st Cir. 1995).  The First Circuit delineated the manner in which Federal Rule of Civil Procedure 56, functions:

> Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists. As

> to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

*McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir. 1995) (citations and some internal punctuation marks omitted).

The Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). While carrying out that task, the Court safely can ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Intern., Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

Once a movant has made a preliminary showing that there exists no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law, the nonmovant bears the burden to show the existence of a genuine material issue, *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996), and must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e).  The non-movant cannot meet this

burden by mere allegation or denial of the pleadings. Fed. R. Civ. P. 56(e). Nor can the nonmoving party avoid summary judgment by relying on conclusory allegations, improbable inferences, unsupported speculation, or "[b]rash conjecture coupled with the earnest hope that something concrete will materialize." *J. Geils Band Employee Benefit Plan,* 78 F.3d at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted). "If no genuine issue of material fact emerges from this perscrutation, then the case may be ripe for summary adjudication." *Suárez,* 229 F.3d at 53.

> **B.      Title 42 U.S.C. § 1983**

Sarria bring this civil rights action pursuant to 42 U.S.C. § 1983, which in its pertinent part provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

As is well established, § 1983 creates no independent substantive rights, but rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 271 (1994). Therefore, to state a cause of action

under 42 U.S.C. § 1983, plaintiffs must allege: (1) that the defendants acted under color of state law; and, 2) that their actions deprived the plaintiffs of a constitutional right. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  Sarria claims his constitutional rights were violated by reason of political discrimination.

### C.    Res Judicata/Collateral Estoppel

Defendants argue that Sarria's claims are precluded by res judicata and/or collateral estoppel.  They contend that the facts of this case have been adjudicated before an administrative forum of Puerto Rico, that there exists the most perfect identity between the parties, the parties had a full and adequate opportunity to litigate the claims, and Sarria never appealed. Therefore, defendants contend the administrative decision is a final adjudication of Sarria's claims. .

Sarria argues that the doctrine of res judicata is inapplicable as there is not the most perfect identity between the things, causes, and persons of the litigants, and their capacity as such.  Sarria asserts that his promotion was legitimate as authorized by GDB officers.  He contends that a favorable decision was rendered in his behalf after certain employees filed an administrative claim challenging his promotion.  He refers to this as the "first" administrative claim.  He further contends that the defendants are "hiding" and not providing information on this first administrative claim.

While Sarria admits that he filed an administrative claim following the annulment of his promotion, he contends that said hearing was a "sham" used as a subterfuge to justify the illegal annulment of his promotion.  He refers to this proceeding as the "second" administrative claim.  As such, it is argued

that the doctrine of res judicata is inapplicable due to a violation of his right to due process.  Sarria further argues there was a ''first'' administrative claim that was valid and that the defendants are incorrect in their allegations that the ''second'' administrative process that resulted unfavorable to Sarria precludes the ''first'' administrative process that was favorable to him.  More so, he argues that the defendants' allegations and cited case law are applicable to the ''first'' administrative process and destroy the ''second'' such that there is a material issue of genuine fact.  Finally, Sarria contends that the report of Attorney Caballero, which was used to void his promotion, was biased, incomplete and not substantiated by law or regulation.

''The doctrine of res judicata promotes the goals of fairness and efficiency by preventing vexatious or repetitive litigation.''  *Caballero-Rivera v. Chase Manhattan Bank*, 276 F.3d 85, 86 (1ˢᵗ Cir.), *cert. denied*, 536 U.S. 905 (2002) (citing *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948)).  It is well established that judicially reviewed administrative fact-finding may later estop a federal claim, even though the state administrative body itself was unable to consider the federal claim as such.  *Báez-Cruz v. Municipality of Comerío*, 140 F.3d 24, 31 (1ˢᵗ Cir. 1998).

Judgments rendered by Puerto Rico state courts are given full faith and credit in this forum as provided for in 28 U.S.C. §§ 1738.  *Báez-Cruz,* 140 F.3d at 28.  Additionally, local provisions are utilized to determine the preclusive effect of those judgments.  *Muñiz-Cortés v. Intermedics, Inc.,* 229 F.3d 12 (1st Cir.2000); *Boateng v. InterAmerican Univ., Inc.,* 210 F.3d 56 (1st Cir.), *cert. denied,* 531 U.S. 904 (2000).  The Puerto Rico Civil Code provides that for a judgment to

have res judicata effect on a subsequent suit it is necessary to have "the most perfect identity between the things, causes, and persons of the litigants" between both actions.  The provision specifically refers to "res judicata" and is also known as claim preclusion.  However, the same principles have been held applicable to the collateral estoppel or issue preclusion doctrine.  *See Báez-Cruz,* 140 F.3d at 29.  Finally, the state court judgment must be final.  31 P.R. Laws Ann. §§ 3343 (1990).  For purposes of the statute the identity of the "things" will depend on whether "[t]he present action derives from the same nucleus of operative facts, and a ruling in [plaintiff's] favor . . . would contradict . . . earlier [factual] determinations." *Boateng,* 210 F.3d at 56.

Collateral estoppel attaches to subsequent suits based on issues of fact previously determined by state court — which facts were necessary for its determination — even if additional claims are asserted.  *Matosantos Commercial Corp. v. Applebee's Int'l,* 245 F.3d 1203, 1208 (10th Cir.2001) ( "[plaintiff] seeks to relitigate the same issues previously decided in the Puerto Rico district court under the guise of new claims for relief; such an approach is inconsistent with the doctrine of collateral estoppel.")  The fact that the two actions are premised on different statutes and different legal theories does not avoid the application of § 3343 provided they arise from the same transaction or transactions.  *Muñiz-Cortés,* 229 F.3d at 15 ("[the use of] different legal theories does not undermine the identity of causes because [both claims] . . . arose from the pacemaker failure"; *Boateng,* 210 F.3d at 62 ("difference in the legal theories asserted in two suits that arise from the same transaction . . . does not undermine the identity of causes between them.")

The statute also provides that 'there is identity of persons whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they are jointly bound with them or by the relations established by the indivisibility of restations . . ." § 3343.  This requirement of mutuality, i.e., identity between the parties, has been interpreted liberally.  The crucial factor is that the parties be given an opportunity to defend their interests in the previous action. *Báez-Cruz,* 140 F.3d at 29.

Sarria makes much of what he calls the "first" administrative claim, the one in which the results were favorable to him.  The record before the court indicates that objections were made to the selection proceedings wherein Sarria was promoted to Pre-Intervention Director.  However, the record further indicates personnel at GDB took no action in regards to these objections.  Hence, it is unclear how Sarria determined said claim was conclusively determined or disposed of in his favor.  More so, nothing indicates that the matter was resolved administratively.

After Sarria was promoted to Director of Pre-Intervention, he was advised of the GDB's intent to declare the appointment null and void and to have him reinstated to his previous position.  An informal hearing was held and following said hearing Sarria was, in fact, separated from the Director's position.  Undisputed is the fact that Sarria sought an administrative review of the actions taken against him at the informal hearing.  The parties to the Administrative Review process were Sarria and the GDB.  In this regard an Examining Officer was appointed, a two-day hearing on the merits was held

and the parties presented documentary and testimonial evidence.  Sarria did not appeal the resolution issued by the examining officer, making it the final decision of the matter.

The parties in the present case are virtually identical.  Additionally, although the legal theories are different, it is undisputed that the claims raised in this Court arise from the same set of facts as the claim determined administratively.  Indeed, the issue determined was whether Sarria was lawfully promoted to the position of Pre-Intervention Director, and the finding was that he was unlawfully promoted.  Said issue cannot be relitigated by this Court.  More so, Sarria raised the issue of political discrimination wherein he claimed that the reinstatement to his previous position of payroll manager, constituted unequal treatment as result of his political idealism.  In finding that the appointment of Sarria as Pre-Intervention Director violated the Principle of Merit and other provisions of the Personnel Regulations, the examining officer implicitly rejected Sarria's claim of political discrimination. Accordingly, the undersigned has no trouble concluding that there is identity of causes.

Furthermore, public policy does not preclude the application of res judicata/collateral estoppel.  Sarria sought to proceed administratively before suing in federal court.   Public policy does not require giving him an opportunity to revisit that choice. *See Báez-Cruz,* 140 F.3d at 30.  Finally, Sarria was given a full and fair opportunity to present his case administratively. While Sarria contends the hearing was a "sham," the fact is that an examining officer was appointed to hear the matter, a hearing was held and Sarria was

given an opportunity to present evidence on his behalf.  Regardless of any inability by the administrative body to consider Sarria's federal constitutional claims, the factual conclusions it made may be given collateral estoppel effect. *Id.*

    Accordingly, based upon the foregoing analysis, the undersigned **RECOMMENDS** that the Motion for Summary Judgment as to the issue of res judicata/collateral estoppel be **GRANTED**.

**D.     Political Discrimination**

    Alternatively, had it been determined that this matter is not barred by res judicata/collateral estoppel, Sarria has failed to provide sufficient evidence of political discrimination to survive a motion for summary judgment.  In *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), the Court established a two-part burden-shifting analysis for evaluating free speech claims.  This analysis has also been applied in the political discrimination context.  *See Rodríguez-Ríos v. Cordero*, 138 F.3d 22, 24 (1st Cir. 1998); *Acevedo-Díaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993).  To meet his burden Sarria needed to show that there is a causal connection linking defendants' conduct to his political beliefs.  *See LaRou v. Ridlon*, 98 F.3d 659, 662 (1st Cir. 1996); *Avilés-Martínez v. Monroig,* 963 F.2d 2, 5 (1st Cir. 1992).  Once this burden is met, the defendants must articulate a nondiscriminatory basis for the adverse employment action and must prove by a preponderance of the evidence that the employment action would have been taken without regard to the plaintiff's politics.  *See Mount Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274 (1977); *Rodríguez-Ríos,* 138 F.3d at 24; *Acevedo-García v. Vera-Monroig,* 30 F.Supp.2d 141, 153 (D.P.R.1998).  "The burden of persuasion is on

the [defendants] to establish a Mount Healthy defense. 'Summary judgment [is] warranted . . . only if defendants' evidentiary proffer compels the finding that political discrimination did not constitute a 'but for' cause for the [employment action].'" *Acosta-Orozco v. Rodríguez-de Rivera,* 132 F.3d 97, 103 (1st Cir. 1997) (quoting *Jirau-Bernal v. Agrait,* 37 F.3d 1, 4 (1st Cir. 1994)).

Sarria bears the initial burden of showing that political discrimination was a substantial or motivating factor in the defendants' employment decisions. To establish a primae facie case of political discrimination, Sarria must produce sufficient evidence in the record that would allow a rational factfinder to find that political affiliation was a substantial or motivating factor behind the adverse employment decision. *See Báez-Cruz v. Municipality of Comerío*, 140 F.3d 24, 28 (1st Cir. 1998), *overruled on other grounds*, 367 F.3d 61 (1st Cir. 2004) (heightened pleading standing is inapplicable in civil rights cases). "This showing requires more than merely 'juxtaposing a protected characteristic--someone else's politics — with the fact that plaintiff was treated unfairly.'" *Id.* (citing *Correa-Martínez v. Arrillaga-Beléndez,* 903 F.2d 49, 58 (1st Cir. 1990); *see, e.g., Rodríguez-Ríos,* 138 F.3d at 24 (evidence demonstrating that defendants were politically active and were aware of plaintiff's opposing views)). In meeting this burden, Sarria does not need to produce direct evidence of a politically-based discriminatory animus, inasmuch as a discriminatory animus may be established with circumstantial evidence alone. *Pagán-Cuebas v, Vera-Monroig*, 91 F.Supp.2d 464, 474 (D.P.R. 2000); *see also Acosta-Orozco v. Rodríguez-de-Rivera,* 132 F.3d 97, 101-02 (1st Cir. 1997)*; Acevedo-Díaz v. Aponte,* 1 F.3d at 69. The operative question in this kind of scenario is "does the

circumstantial evidence taken as a whole, give rise to a plausible inference of discriminatory animus which, ultimately possesses enough convictive force to persuade a rational fact-finder that the defendants' conduct was politically motivated?" *Anthony v. Sundlun*, 952 F. 2d 603, 606 (1st Cir. 1991).

A highly charged political atmosphere whereby one political party takes over power from another, combined with the fact that the plaintiff and defendants are of opposing parties, may be probative of a discriminatory animus. *See Id.* Other factors that have been found to show discriminatory animus include the fact that the plaintiff was a known member of the opposing political party, that the position was then filled by a member of the opposite political party, and that everyone of the plaintiff's party was demoted after a change in office. *Flores-Camilo v. Alvarez-Ramírez*, 283 F.Supp.2d 440, 447 (D.P.R. 2003) (citing *Rodríguez-Pinto v. Tirado-Delgado*, 982 F.2d 34, 40 (1st Cir. 1993); *Rivera-Ruiz v. González-Rivera*, 983 F.2d 332, 335 (1st Cir.1993); *Acevedo-García v. Vera-Monroig*, 30 F.Supp.2d 141 (D.P.R. 1998) *aff'd,* 204 F.3d 1 (1st Cir. 2000)).

In the present case Sarria had adduced evidence that he suffered an adverse employment action — that is, following a promotion the process was determined to be null and void and he was reinstated to his previous position. In addition to showing that he had suffered an adverse employment action, Sarria must also show a causal connection between this action and his political affiliation. *See LaRou v. Ridlon,* 98 F.3d 659, 662 (1st Cir. 1996). In this regard, defendants contend that Sarria failed to establish a prima facie, First Amendment claim because there is no evidence that Sarria engaged in any constitutionally protected political activity.

As noted above when one political party takes power from another, and that fact is combined with the fact that the plaintiffs and defendants are of opposing parties, same may be probative of a discriminatory animus. *See Acevedo-Díaz,* 1 F.3d at 69. Such a change in power took place in Puerto Rico when the November elections resulted in a change in leadership from the NPP to the PDP. After the elections a new President of the GDB was designated and the adverse actions of which Sarria complained followed. Defendants, however, point to Sarria's deposition testimony wherein he testified that while a life-long member of the NPP, he was never politically active. Sarria described the extent of his NPP activity as that of voting for the NPP. Sarria assured he did not participate in political activities, caravans or rallies nor did he make monetary contributions to the NPP. More so, at the GDB he never participated in any organization of NPP employees.

Sarria further testified that he never told anyone in the GDB of his political affiliation. He testified that people may have known he belonged to the NPP because of the persons he spent time with such as Iván Muñiz and Pablo Torres, but that he never spoke to Agosto-Alicea about his political affiliation. Finally, Sarria testified that he once met with Pedro Cintrón, Vice President of Administration and Accounting. On such occasion, Sarria recalled being told by Cintrón that, even though he [Sarria] was NPP, as Vice President he [Cintrón] was there to treat everyone the same.

In an attempt at damage control, Sarria presented the affidavit of his wife, Audrey Esther Morales-Rivera de Sarria (hereafter "Mrs. Sarria"), dated January 8, 2004. Mrs. Sarria states that her husband had always been an

activist of the NPP participating in caravans, meetings, rallies, selling tickets and as an electoral officer representative the NPP.  She further states that her husband was very active in all NPP activities where the GDB co-workers participated.   She explains that she was not present at her husband's deposition, but "was close and heard everything" and that when Sarria was questioned about his participation in  politics he understood it "was in the GDB and during working hours."

The court is troubled by this affidavit particularly in light of the fact that Mrs. Sarria makes it clear she was not present at the deposition of her husband, but merely "overheard" what was said.  More so, even though she is not a party, as Sarria's spouse, Mrs. Sarria clearly has an interest in the outcome of the case.

The First Circuit has found that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons,* 44 F.3d 1, 4-5 (1st Cir.1994); *see also, Morales v. A .C. Orssleff's EFTF,* 246 F.3d 32, 35 (1st Cir.2001) (a party may not create an issue of fact simply by submitting a subsequent contradictory affidavit); *Torres v. E.I. Dupont de Nemours & Co.,* 219 F.3d 13, 20-21 (1st Cir.2000) (post-summary judgment affidavit that contradicted sworn deposition testimony did not indicate that there was confusion at the time of the deposition or that the prior testimony was in error).  This language does not mean, however, that all changes to a party's testimony are prohibited.  The court has held that it would be an abuse

of discretion to disregard an affidavit pertaining to previously identified incidents that are merely described with more specificity in the affidavit. *Hernández-Loring v. Universidad Metropolitana,* 233 F.3d 49, 55 (1st Cir.2000).

The above-cited case law refers to a contradictory affidavit of a party. In the present case, the contradictory affidavit belongs to a nonparty, the plaintiff's wife. Some courts have extended the above principle to post-deposition affidavits of a non-party that contradicts prior deposition testimony of party. *See Prosser v. Ross,* 70 F.3d 1005, 1008 (8th Cir.1995); *Carey v. Shiley, Inc.,* 32 F.Supp.2d 1093 (S.D. Iowa 1998); *Lugo v. Milford Management Corp.,* 956 F.Supp. 1120, 1129 n. 7 (S.D.N.Y.1997).

Mrs. Sarria's affidavit is proffered to contract her husband's deposition testimony and to create an issue of fact. A reading of the deposition transcript reveals that the questions posed to Sarria at his deposition were unambiguous as were Sarria's answers. Indeed, one of the questions posed to Sarria was, "did you ever participate in any New Progressive Party Employees Association at the Bank" to which Sarria replied, "No." There was nothing confusing about the questions asked Sarria. More so, Sarria's attorney was present at the deposition and had the opportunity to clarify any incorrect impressions. Further, after receipt of the deposition transcript Sarria had the opportunity to review and make corrections to the same. Finally, the undersigned finds it significant that the affidavit was offered only after the filing of the motion for summary judgment. Sarria was deposed on July 31, 2003, the defendants' motion for summary judgment was filed on October 28, 2003, but Mrs. Sarria's affidavit was not signed until January 8, 2004, one day

prior to the filing of Sarria's response to Defendant's Motion for Summary judgment.[5]   Accordingly, the undersigned disregards the affidavit of Mrs. Sarria.  While doing so, the undersigned also looks to other evidence in the record to determine if Sarria has proffered a prima facie case of political discrimination.

Sarria argued that the defendants singled out personnel transactions of employees affiliated with the NPP immediately after the PDP administration took effect.  Sarria proffered deposition testimony of several individuals (all in Spanish) which the Court cannot consider pursuant to First Circuit precedent.   Even if the undersigned did consider the contents of these testimonies, the undersigned notes that Attorney Caballero, who was retained to review the personnel transactions, testified that she did not find all transactions null.  More so, the findings of the examining officer at the administrative level indicate that when Agosto-Alicea began to perform as President for the GDB he was interested in analyzing personnel transactions, among these all appointments made from July to December 2000 in order to ensure these designations met the Personnel Regulations and the electoral ban requirements.   Although several personnel files were examined, not all appointments were determined null.   There is no mention of political affiliation.  Finally, Sarria, by his very testimony stated that he was not active

---

[5]  The time elapsed, presumably, provided counsel for plaintiff and plaintiff the opportunity to have corrected or clarified any misstatements made by Sarria during his deposition.  Of particular consideration as well is the fact that the affidavit was signed and submitted approximately six months after Sarria's deposition, at a time in which, although under treatment, it appeared plaintiff was still capable of participating in the case evaluation process.

in the NPP and he was not aware if the defendants knew of his political affiliation.

While Sarria may not agree with his reinstatement to the position of Payroll Manager, the record does not indicate that such action was undertaken due to his political affiliation.  To occupy the position of Director of Pre-Intervention, clear and specific qualifications were demanded by the GDB's Class Specification.  Initially, it had been determined Sarria did not meet said requirements.  Thereafter, others in supervisory and managerial positions decided to look for a way in which to lower the job requirements and, once done, proceeded to appoint Sarria as Director.  All of this was done without consulting their legal division.  Quite simply, Sarria has not raised a plausible inference that he was subjected to discrimination on the basis of his political views or affiliation.  Consequently, he fails to meet his burden under *Mt. Healthy.*

Even though Sarria did not meet his burden under Mt. Healthy, the undersigned addresses the defendants' position that they would have taken the same actions regardless of Sarria's political beliefs.  Defendants argue that the basis for the personnel decisions was not based upon political affiliation, but due to irregularities in Sarria's promotion to Pre-Intervention Director. Defendants' position is well-taken.  It is undisputed that the requirements for the Pre-Intervention Director were not only changed but lowered and subsequent to such event Sarria was appointed to the position on an interim basis.  Despite the change in the qualifications to the position at the time he was so appointed, Sarria still did not have the required years of prior experience. Indeed, following Sarria's appointment, other employees objected

to the appointment process followed by the management.  The defendants' position is further buttressed by the findings of the examining officer finding and pointing to the fact that the selection and appointment process undertaken affected the rights of other qualified people.  As such, the selection process was determined to be invalid pursuant to Personnel Regulations.  Sarria's position that  political discrimination was a substantial or motivating factor behind his removal from the Pre-Intervention Director and reassignment to payroll manager is not borne out by the record.

Based on the foregoing analysis, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** as to the issue of political discrimination. This Recommendation, if adopted, effectively disposes of the complaint filed by Sarria.  Regardless, the undersigned will address the other issues raised by defendants.

### E.    Due Process

The Due Process Clause guarantees public employees with a property interest in continued employment the right to a pre-termination hearing.  *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985).  For Sarria to have a due process claim, he must have a property interest in his position.  *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972).  The question of whether a person has a constitutionally protected property interest is answered by an independent, extra-constitutional source such as state law.  *See, e.g., Correa-Martínez v. Arrillaga- Beléndez,* 903 F.2d 49, 53 (1st Cir. 1990).   Under Puerto Rico law, a career position is a constitutionally protected property interest.  *Kauffman v. Puerto Rico Tel. Co.,* 841 F.2d 1169, 1173 (1st Cir. 1988).  That property right is void,

however, if the employee acquired the career position through a violation of the Puerto Rico Personnel Act. *Id.*

Here, it is uncontested that Sarria received notice and a hearing before the government undertook any adverse employment action.  Thus, he received the procedural protections afforded by the due process clause.  This case differs from the scenario where a public employee is summarily dismissed without receiving notice or an opportunity to be heard.  *See, e.g., Rivera-Ruiz v. González-Rivera,* 983 F.2d 332, 334 (1st Cir. 1993) (plaintiff never received a hearing prior to demotions or transfers); *Acosta-Orozco v. Rodríguez-de Rivera,* 132 F.3d 97, 100 (1st Cir.1997) (plaintiffs were not afforded a hearing or opportunity to be heard prior to demotions).  In those circumstances, courts have looked to whether the plaintiffs have a property interest in their job, because it determined whether they were entitled to receive the procedural protections guaranteed by the due process clause.  In the present case, Sarria was afforded with proper notice, a hearing and the opportunity to appeal the adverse determination at the administrative level.  At said level it was determined Sarria had been appointed to a new position in violation of Personnel Regulations and the Class Specifications for the GDB.  As such, plaintiff has no further remedy under the due process clause, inasmuch as the defendants afforded him all the process that was due.

Accordingly, it is **RECOMMENDED** that the due process claim be **DISMISSED**.

   **F.    Qualified Immunity**

Agosto-Alicea argues that he is entitled to qualified immunity for his actions.  He argues that when he began as President of the GDB he ordered an investigation and evaluation of all appointments made during the period between July and December 2000, and a determination on whether these had been done pursuant to applicable law and regulation.  He further argues that he retained and assigned Attorney Caballero to conduct the assessments and that he relied upon her legal opinion and assessment in determining that Sarria's appointment was null and void.

Qualified immunity shields government officers performing discretionary functions from civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right which should have been known.  *See Harlow v. Fitzgerald* 457 U.S. 800, 818 (1982); *Ringuette v. City of Fall River,* 146 F.3d 1, 5 (1st Cir. 1998).  In deciding whether an officer is entitled to qualified immunity, the Court must first determine whether the officer's alleged conduct violated a constitutional right. *Chávez v. Martínez*, 535 U.S. 1111 (2003) (citing *Saucier v. Katz*, 533 U.S. 191 201 (2001).  "If not, the officer is entitled to qualified immunity, and [the Court] need not consider whether the asserted right was "clearly established." *Id.*

The First Circuit Appellate Court has identified a three step process for evaluating qualified immunity claims.  In making such determination one must consider:

> (1)  whether the claimant has alleged the deprivation of an actual constitutional right;  (2) whether the right was clearly established at the time of the alleged action or inaction;  and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action

> taken violated that clearly established constitutional right. *Nelson v. Kline,* 242 F.3d 33, (1st Cir. 2001); *Abreu-Guzmán v. Ford,* 241 F.3d 69, 73 (1st Cir.2001); *see Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

*Starlight Sugar, Inc., v. Soto*, 253 F.3d 137, 141 (1st Cir. 2001), *cert. denied,* 534 U.S. 1021 (2001).

As the First Circuit notes, "[t]his particular order of analysis 'is designed to "spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit."'" *Id.* (citations omitted).  Addressing the constitutional question first "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public."  Id.

Defendant Agosto-Alicea argues that he is entitled to qualified immunity because he reasonably relied upon the opinion of an expert in personnel issues.  While this may be the case, the record contains only argument and no sworn statement or testimony from Agosto-Alicea as to his method or their belief that he properly relied upon the report of Attorney Caballero.  Nor was the Court provided with any evidence that defendant Agosto-Alicea believed at all times that his conduct was warranted and that he did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known.  Nevertheless, as discussed above, the undersigned must first determine whether the conduct of Agosto-Alicea violated a constitutional right.  Considering it was previously determined that no political discrimination occurred, consequently, no constitutional violation ensued.  Because of this conclusion, as the United States Supreme Court

recently held, it is unnecessary to consider whether the right asserted was "clearly established." *See Chávez v. Martínez*, 535 U.S. 1111 (2003).  Accordingly, the inquiry ends and it must be concluded that  defendant Agosto-Alicea is entitled to qualified immunity.

Based upon the foregoing, it is **RECOMMENDED** that the motion for summary judgment as to the issue of qualified immunity be **GRANTED**.

### G.   Supplemental State Claims

 As a general rule, where the district court dismisses the federal claims before trial, the court should dismiss the state law claims without prejudice. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966); *Rodríguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995).  Here, the 42 U.S.C. § 1983 claim is barred by the applicable statute of limitations.  Accordingly, it is **RECOMMENDED** that any supplemental state claims, be **DISMISSED**, without prejudice.

### III.   Conclusion

It is, therefore, **RECOMMENDED** that Defendants' Motion for Summary Judgment **(Docket No. 46)** be **GRANTED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(a) of the Local Rules of Court.  Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of notice.  Rule 72(d), Local Rules of Court; Fed. R. Civ. P. 72(b).  Failure to timely file specific objections to the Report and Recommendation waives the right to review by the District Court, and waives the right to appeal

the District Court's order. *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).  The parties are advised that review of a Magistrate-Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate-Judge.  *Paterson-Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir. 1988).

**SO RECOMMENDED.**

At San Juan, Puerto Rico, on this 31st day of July, 2004.


**S/AIDA M. DELGADO-COLON**
**U.S. Magistrate-Judge**